UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**

07-CR-870 (NGG)

-against-

EDGAR ADAM MATOS,

Defendant.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

The Government moves for reconsideration of this court's September 23, 2008 Order suppressing physical and testimonial evidence obtained as a result of the unlawful arrest of Defendant Edgar Matos ("Defendant" or "Matos"). (See Gov't Motion for Reconsideration ("Gov't Motion") (Docket Entry #44); Gov't Post-Hearing Memorandum in Support of Motion for Reconsideration (Docket Entry #63).) The court has held a supplemental suppression hearing and has invited post-hearing briefing on the issues posed by the Government's Motion. As set forth below, the court has reviewed its decision in light of the Government's new evidence, and has reached the same result. The Government's Motion is DENIED.

I. BACKGROUND

Matos was apprehended by a team of officers from the United States Marshal Service Fugitive Task Force (the "Fugitive Task Force Team") while the team was staking out an apartment in pursuit of his cousin, Anthony Matos, a fugitive wanted for murder. Following a search of the apartment, Matos was charged with possession with intent to distribute 500 grams or more of cocaine. Matos moved to suppress all evidence obtained in the course of his arrest, alleging multiple constitutional violations. The original suppression hearing was held on May

1

15, 2008 (the "May Hearing").  (See Transcript of Suppression Hearing dated May 15, 2008 ("May Tr.").)  On September 23, 2008, the court found that the arrest of Matos lacked probable cause, and suppressed allegedly incriminating statements made by Matos in the course of his arrest (and in the absence of Miranda warnings) and physical evidence obtained from a search of a locked cabinet in his apartment as fruit of the unlawful arrest.  (See Memorandum & Order dated Sept. 23, 2008 ("Suppression Order") (Docket Entry #36).)  In reaching this conclusion, the court discredited the testimony of the two arresting officers, Deputy United States Marshal Dennis Tait ("Deputy Tait") and New York City Police Department Detective Adam Heege ("Detective Heege").  (Id.)  Specifically, the court rejected the officers' contention that they arrested Matos because they saw him reach into his waistband and throw two Ziploc bags of cocaine to the ground in plain view when he exited his apartment.  (See id. at 8.)  Familiarity with the facts underlying the Suppression Order is otherwise assumed.

The Government contested the court's decision and moved to re-open the suppression hearing, arguing that the testimony of additional officers would corroborate the testimony of Deputy Tait and Detective Heege and provide the court with further context to justify the challenged arrest.  (See Gov't Motion 1-2.)  The Government claimed that this evidence had been omitted from the original hearing because it was only "cumulative" of Deputy Tait and Detective Heege's testimony.  On December 5, 2008, the court granted the Government's Motion, and heard testimony from six additional members of the Fugitive Task Force Team, as well as additional testimony from Deputy Tait and Detective Heege, in a supplemental suppression hearing on February 17-18, 2009 (the "Supplemental Hearing").  See United States v. Matos, 07-CR-870 (NGG), 2008 WL 5169112, at *1 (E.D.N.Y. Dec. 8, 2008); (Transcript of Supplemental Hearing dated February 17-18, 2009 ("Supp. Tr.")).

## II.   STANDARD

Previously, this court noted that "[t]he Second Circuit has expressly deferred the question of what legal standard applies to a motion to re-open a suppression hearing" in order to reconsider a suppression order.  Matos, 2008 WL 5169112, at *1 (analyzing United States v. Bayless, 201 F.3d 116, 131-32 (2d Cir. 2000)).  Since the time of the court's prior ruling, the Second Circuit has clarified that "there is no bright-line rule that necessarily and invariably requires the government to provide a reasonable justification for its failure to offer relevant evidence at an earlier suppression proceeding."  In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 177, 196 (2d Cir. 2008).  The Circuit held that "[w]hether or not the government can justify its delay is simply one factor, among others, that a district court may consider when deciding whether to reopen a suppression hearing."  Id. at 196-97.  Ultimately, the Circuit committed such decisions to the discretion of the district court, finding that "a district court should be permitted, in the exercise of its discretion and in light of the totality of the circumstances, to determine whether its suppression ruling should stand."  Id. at 197.

In the exercise of the court's discretion, the court finds that the general standard for reconsideration also provides relevant guidance.  See United States v. Basciano, No. 03-CR-929 (NGG), 2008 WL 905867, at *1 (E.D.N.Y. Mar. 31, 2008) (noting that courts in this district resolve motions for reconsideration in criminal cases according to the same principles that apply in the civil context) (citing United States v. Morrison, No. 04-CR-699 (DRH), 2007 WL 4326796, at *1 (E.D.N.Y. Dec. 7, 2007)).  The standard for a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  Shrader v. CSX Transp.,

Inc., 70 F.3d 255, 257 (2d Cir. 1995) (citation omitted). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Morrison, 2007 WL 4326796, at *1 (citation and internal quotation marks omitted).

### III. DISCUSSION

At the May Hearing, Deputy Tait and Detective Heege attempted to justify the arrest and the subsequent actions of the Fugitive Task Force Team by weaving together a sequence of allegedly voluntary self-incriminating acts by the Defendant. First, Deputy Tait and Detective Heege claimed that they were provoked to arrest Matos because, as they approached him, he reached into his waistband and tossed two Ziploc bags containing cocaine to the ground in their plain view. (See Suppression Order 3.) Second, they claimed that they entered Matos's apartment because, once he was handcuffed and under arrest, he asked to be taken inside. (Id.) Third, the officers claimed that once inside, Matos spontaneously blurted out that he had a stash of drugs in a locked cabinet, and offered them permission to search the cabinet and seize the drugs. (Id. at 3-4.) The officers delayed issuing Miranda warnings to Matos for nearly two hours after he was detained, contending that no interrogation occurred during this period because all of Matos's statements were voluntary and spontaneous. (Id. at 4-5.) As reviewed above, the court decided the motion at the threshold issue of the legality of the arrest and suppressed the evidence.

The additional testimony offered by the officers at the Supplemental Hearing corroborated some peripheral facts surrounding the arrest. Four other officers testified that they saw the allegedly discarded plastic bags in some form when they arrived on the scene. Deputy Ricigliano testified that when he joined the other officers, he saw plastic bags containing drugs

4

on the ground. (Supp. Tr. 46 (testifying that bags appeared to contain marijuana and crack cocaine).) Deputy Zeppetelli testified that when they arrived on the scene, he saw Detective Heege picking up two plastic bags of narcotics; his partner in the stakeout, Deputy McCluskey recalled seeing a "parcel wrapped in plastic" on the ground. (Id. at 87, 89 (Zeppetelli), 156 (McCluskey) (adding that "from the distance and with the dark lighting, I couldn't see exactly what it was").) Deputy Dundon was positioned at the top of the stairs above the target apartment, but never saw Matos reach to his waist or toss the plastic bags to the ground. (See id. at 189-94.) When he came down the stairs and met the officers, he saw two plastic bags that appeared to contain drugs in Detective Heege's hand. (Id. at 196.) The officers consistently maintained that the encounter with Matos was calm and that no one yelled at him. (Id. at 47, 90, 158-59, 167.) Deputies Ricigliano, Zeppetelli, and Dundon also recalled hearing Matos tell the officers to "get me off the street" or that he wanted to go back inside his apartment. (Id. at 45, 90, 194.) The officers' observations of the plastic bags and their description of the encounter provide circumstantial support for Deputy Tait and Detective Heege's testimony, and call into question the accuracy of Matos's own self-serving account presented at the May Hearing.

However, no new testimony was offered at the Supplemental Hearing to provide clarity on the central issue: whether Matos in fact tossed plastic bags of drugs to the ground when he exited the apartment, thereby provoking the arrest. No one other than Deputy Tait and Detective Heege claimed to have seen Matos reach to his waist and drop the packages of drugs, the sole justification offered for the arrest. (Id. at 64-65 (Ricigliano), 109 (Zeppetelli), 173-74, 180 (McCluskey), 209-10 (Dundon).) Deputy Dundon was situated directly above the scene, just about ten steps above the target ground floor apartment, but never saw this motion. (See id. at 189-94, 209-10; see Gov't Ex. 4.) By the time the rest of the officers joined Detective Heege

5

and Deputy Tait, Matos was already in handcuffs. (Supp. Tr. 156 (McCluskey), 195-96 (Dundon).)

Furthermore, some of the new testimony conflicted with Deputy Tait and Detective Heege's account of the arrest. Although the officers contended at the May Hearing that no officer drew a weapon during the arrest, see Suppression Order 3 (citing May Tr. 10, 28, 42), Deputy McCluskey testified that both he and Deputy Zeppetelli drew their weapons, though they deny pointing them at Matos. (Supp. Tr. 157-58 (McCluskey); but see id. at 90 (Zeppetelli testifying that he did not draw his gun).) Deputy Tait and Detective Heege both testified at the May Hearing that after he was handcuffed, Matos voluntarily invited the officers into his apartment and somehow provided them with the keys to unlock the door, but neither could recall who had taken the keys from Matos. (Suppression Order 3 (citing May Tr. 13, 29-30, 42, 61).) At the Supplemental Hearing, however, where all seven of the Fugitive Task Force Team members testified, not one witness recalled taking the keys from Matos to enter the apartment. (See Defendant's Motion in Opposition (Docket Entry #71) 15; see, e.g., Supp. Tr. 91 (Zeppetelli), 161 (McCluskey).) Several of the officers testified that they heard Detective Heege announce over the radio that Matos was not their fugitive, but other officers testified that this determination was not made until after Matos was arrested. (See Supp. Tr. 42 (Ricigliano), 86-87 (Zeppetelli) (testifying that they heard this announcement); see also id. at 157, 173 (McCluskey) (testifying that he heard that the man "could not be positively identified as Anthony Matos" and that he learned Matos was not the fugitive upon arrival at the scene), 30 (Romani) (testifying that he was not aware that Matos was not the fugitive, and that he recalled hearing "he's coming out, or someone's coming" over the radio).)

6

The supplemental testimony also provided critical context for the encounter that supports this court's conclusion that Matos was seized "as a conduit to catch his cousin." (Suppression Order 11.) The testimony revealed that shortly before Matos's exit from the apartment, the Fugitive Task Force Team had already implemented a plan to enter the apartment. (See Supp. Tr. 41, 84 (Heege) ("Somebody made the decision that we were going to go and knock on the door to find out what was going on inside"), 186-87.) As Detective Heege explained at the Supplemental Hearing:

> [W]e always had intentions of going to the apartment. That was never in dispute. It was just a matter of when we were going to go and how we were going to do it.

(Id. at 123-24.) After three hours of vigilant surveillance, the officers decided to take action, believing that the fugitive, Anthony Matos, was inside. Two officers knocked on the door of the apartment upstairs from the target apartment, to request access to the backyard so that they might cover all exits in case the fugitive tried to run. (Id. at 16-18, 187-88.) In fact, one of the officers dashed through the upstairs residence to cover this back exit when Matos appeared at the front door. (Id. at 17-18, 30-31 (Romani).)

The officers' collective testimony makes clear that within minutes of exiting his apartment – by some accounts, seconds – six armed officers descended upon Matos. As Detective Heege stated, once he and Deputy Tait exited their vehicle to approach Matos, the entire team had to "move in because we had no choice. We were out in the street. We showed ourselves." (Id. at 126.) By this time, the officers were determined to enter the apartment and capture their fugitive. In fact, Deputy McCluskey testified that when the officers entered the apartment, he believed they were doing so in order "to ascertain whether or not the individual sought . . . in connection with the homicide was inside." (Id. at 160.)

7

This testimony about the circumstances of the arrest was conspicuously absent from the May Hearing. At the May Hearing, Deputy Tait and Detective Heege represented that they simply exited their vehicle when Matos emerged from the apartment "to attempt to interview him." (Suppression Order 2 (citing May Tr. 9-11, 40).) The court found that this explanation for their actions "strain[ed] credibility" given the secretive nature of the stakeout. (Suppression Order 9.) The officers' prior testimony framed the story as though the entire chain of events – the entry to the apartment, the questioning of Matos within the apartment, and the search of the locked cabinet – was triggered solely by the alleged toss of the plastic bags and Matos's arrest for possession. The new revelation that the officers had already decided to seek entry to the apartment severely undermines the Government's position that these events were propelled purely by Matos's own voluntary actions, and supports the court's original finding that the officers "exploited the opportunity to hold [Matos] in custody and escalated their investigation" when they intercepted and arrested Matos. (Id. at 11.)

None of the evidence presented at the Supplemental Hearing was newly discovered or previously unavailable to the Government. The Government apparently chose not to present this additional evidence at the May Hearing because it expected the testimony of Deputy Tait and Detective Heege to be sufficient. Some of the evidence at the Supplemental Hearing corroborated the testimony of Deputy Tait and Detective Heege, and clarified open questions raised by the Suppression Order. However, in other respects, the new evidence heard at the Supplemental Hearing heightened the court's concerns about the validity of the arrest.

Reviewing the totality of the circumstances, the court concludes that the additional evidence offered at the Supplemental Hearing does not justify reconsideration of the court's Suppression Order. The government has not met its burden to prove that there was probable

8

cause for the arrest and that the related evidence was legally obtained.  See United States v. Pena, 961 F.2d 333, 338-39 (2d Cir. 1992).  The court remains unpersuaded by the Government's theory that the evidence against Matos was obtained through a series of fantastic coincidences: that, at the precise moment that the team decided it was necessary to seek entry to the apartment, an individual exited the residence, tossed evidence of criminal contraband in the plain view of the officers, and then invited six armed officers into the apartment – all the while spontaneously volunteering incriminating statements and substantial quantities of narcotics to the officers.  The court did not find this account to be credible at the May Hearing, and the testimony presented at the Supplemental Hearing has not changed the court's view.  Because the court finds the evidence insufficient to demonstrate error in the Suppression Order, the court declines to alter its conclusions.

## IV. CONCLUSION

For the reasons set forth above, the Government's Motion is DENIED.  The Suppression Order shall remain in effect unaltered.

SO ORDERED.

                                                        s/ Nicholas G. Garaufis
Dated: Brooklyn, New York                           NICHOLAS G. GARAUFIS
September 3, 2009                                     United States District Judge